HENRIETTA SPINNEY *vs*. R. M. BRADLEY & CO. INC.
(and three companion cases[1]).

Suffolk.    October 10, 1940. — December 31, 1940.

Present: FIELD, C.J., DONAHUE, DOLAN, COX, & RONAN, JJ.

*Landlord and Tenant*, Landlord's liability to tenant, Ceiling. *Negligence*, One owning or controlling real estate.

A finding of negligence of a landlord toward a tenant in failing to repair a plaster ceiling within a reasonable time after knowledge of its defective condition was warranted by evidence showing knowledge of the fact that after the tenancy began and a year or two before the falling of a portion of the plaster there had been a leak of water from the floor above which tended to weaken the bond of the plaster, and of a condition a week or two before the fall which, by reason of the location of the building near a street where there were jars from heavy traffic, called for immediate attention, but that the landlord did not give it such attention.

FOUR ACTIONS OF TORT.   Writs in the Superior Court dated March 12, 1936.

Before *Swift*, J., there were verdicts for the plaintiff Henrietta Spinney in each action brought by her in the sum of $3,000, and for the plaintiff William R. Spinney in each action brought by him in the sum of $500.

*S. P. Sears*, (*R. Maguire* with him,) for the defendants.
*R. J. Walsh*, for the plaintiffs.

COX, J.   It expressly appears from the bill of exceptions that the only issue raised is whether the trial judge should have granted the defendants' motions for directed verdicts. Henrietta Spinney seeks to recover damages for personal injuries sustained by her on September 5, 1935, when a ceiling fell in the apartment that she and her husband, the other plaintiff, occupied in a building owned by the defendant Skinner and managed by the other defendant, hereinafter referred to as the company.   William R. Spinney, who sues to recover for his consequential damages, entered

---

[1] The companion cases were Henrietta Spinney *vs*. Harry Skinner, William R. Spinney *vs*. R. M. Bradley & Co. Inc., and Same *vs*. Harry Skinner.

the employ of the company in May, 1935, as janitor of the building in question. The defendants concede that the room where the plaster fell was in their control, and it is unnecessary to determine the precise status of the plaintiffs' occupancy as to either defendant, for the defendants concede that they were obliged to keep the ceiling in the same condition in which it was or appeared to be when the plaintiffs moved into the apartment. (See *Shrigley* v. *Boston Symphony Orchestra, Inc.* 287 Mass. 300, 302, 303; *Orcutt* v. *Signouin*, 302 Mass. 373, 377; *Chambers* v. *Durling*, 306 Mass. 327.) They also concede that there was a change in the condition of the ceiling as evidenced by a crack and bulge, and that it then became their duty to restore the ceiling to its former condition. They contend, however, that they were entitled to a reasonable time within which to make these repairs, and that, in the circumstances, there was no evidence of their negligence, that is, a failure to use reasonable care to restore the ceiling to its former condition.

The jury could have found that a week or two before the plaster fell Mrs. Spinney directed the attention of the company's manager and another employee to the condition of the ceiling and the manager said that it would be taken care of, but that nothing was done. In January, "1933 or 1934," as a result of the freezing of pipes in the suite directly over the room occupied by the plaintiffs, "a good deal" of water came through the floor and down through the ceiling in the same section where the plaster later fell. It does not appear that anything was thereafter done to the ceiling except to calcimine it. When water comes down through a ceiling, it has a tendency to weaken the bond or the clinching of the plaster. Sometimes it breaks the rivet that binds the plaster to the laths, and sometimes it does not, but if a bulge is seen in the plaster, that is a warning that it is dangerous. There was evidence of a bulge in the plaster, and it looked as if it might fall "on one occasion, just prior to this accident." When the attention of the manager was directed to the condition of the plaster, he examined it and made tests by pressing a broom handle

against it.  He testified that at that time there was a crack and that the ceiling was recessed, that is, one part was slightly lower than the other, and the fact that the plaster was hanging down or recessing would mean that that area had parted from its bond, and that the depressed area did not give way "to the broomstick for the simple reason that the excess weight was probably more than the pressure he exerted for a normal plaster."  In this connection there was evidence that the plaster was very thick, from one to one and one half inches, and that the area that fell, which could have been found to be about four or five by nine feet, weighed three or four hundred pounds.  The building in question was located on a street in Boston where the traffic is very heavy, and there was jar enough so that the pictures on the wall had to be straightened nearly every day and the vibration could be felt in the building.  The crack in the plaster was so wide that dust and "stuff" were dropping every day or two, and the crack kept increasing a little every day, so that two or three days before the injury it was about two thirds of the way across the room.  The defendants knew that the water had come down through the ceiling, and one of the company's employees had learned of it "from the office records."

We are of opinion that there was no error.  It was for the jury to say whether, in the circumstances, the defendants were reasonably diligent in making the repairs which they concede they should have made.  It is true that the manager of the company testified that he tested the ceiling "as . . . [he tested] all ceilings," by putting the end of a broomstick up "in the ceiling that . . . [appeared] to be loose" and by exerting a certain amount of pressure, and that by this test the ceiling was sound, that is, "it didn't give."  It was for the jury to determine whether to accept this evidence, but he further testified that he made a notation in his book that "certainly" the next time he had the plasterer in the building he would have him look at it.  The jury could have determined that, in the circumstances, a condition existed that ought not to wait for the routine arrival of the plasterer.  See *Green* v. *Pearlstein,* 213 Mass.

360;  *Rosen* v. *Burnham*, 272 Mass. 583, 586;  *Shrigley* v.
*Boston Symphony Orchestra, Inc.* 287 Mass. 300, 302;  *Orcutt*
v. *Signouin*, 302 Mass. 373, 376, 377;  *Shwartz* v. *Feinberg*,
306 Mass. 331, 333–334.   Compare *Wadleigh* v. *Bumford*,
229 Mass. 122;  *Roderick* v. *Kondazian*, 258 Mass. 477.

*Exceptions overruled.*